## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

**Amber Kidd**

**On behalf of Herself and
all others similarly situated**

    **Plaintiff**

    **v.**                                             Case No.  24-cv-356

**Drexel Building Supply, Inc.**

    **Defendant.**

## COMPLAINT

Plaintiff, by her attorneys, for his Complaint against Defendant states as follows:

1. This is a proposed collective action under the Fair Labor Standards Act, as well as a proposed class action under Wis. Stat. §109.03(5) by Plaintiff to seek redress, under both the FLSA and Wisconsin law, for the Defendant's failure to include certain cash payments made to its employees in the computation of said employees' regular rates.  Plaintiff additionally advances the individual claim under the FLSA and Wisconsin law that when she was scheduled to start work at 6:30 a.m., she was not paid for her work time between when she punched in and 6:30 a.m.

### JURISDICTION AND VENUE

2. This court has subject matter jurisdiction under 29 USC §216(b) and 28 U.S.C. §1331 because Plaintiff alleges violations of the FLSA, 29 U.S.C. §201 et seq.

1

3. This Court has supplemental jurisdiction over Plaintiff's claims brought under Wisconsin law pursuant to 28 U.S.C. §1367 because they are based upon the same nucleus of operative facts, and therefore form the same case or controversy as her FLSA claims.

4. This Court has personal jurisdiction over Defendant Drexel Building Supply, Inc. ("Drexel") because it is based in and operates its business in Wisconsin.

5. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1) and (d) because Drexel operates a store at Columbus, Wisconsin within this District, so that it has a continued and substantial presence in, and sufficient contacts with the Western District of Wisconsin to be subject to personal jurisdiction in this District, so that it may be deemed to reside within this District. Moreover, convenience of the parties is about the same whether this case is venued in the Eastern or Western District of Wisconsin, given that it takes less than half a hour longer to travel from Drexel's corporate headquarters in Campbellsport, Wisconsin to Madison versus Milwaukee.

**THE PARTIES**

6. Plaintiff Amber Kidd is an adult resident of Wisconsin who worked as a Pre-Finisher for Stain and Paint for Drexel in 2022 and 2023. A copy of the FLSA consent signed by Kidd is being filed with the Court at the same time that this Complaint is filed with the Court.

7. Drexel is a domestic Wisconsin company headquartered in Campbellsport, Wisconsin. Drexel operates locations throughout Southeastern and Southcentral Wisconsin that manufactures and supplies building materials to builders and construction companies.

9. Drexel both was and is an employer engaged in interstate commerce within the meaning of the FLSA, 29 U.S.C. §203, by, for example, purchasing equipment, materials, and other supplies that originated from outside the State of Wisconsin and manufacturing and selling

products that would ultimately be used and installed outside the State of Wisconsin. At all relevant times, Defendant Drexel has had annual gross volume of business at or above $500,000.

10. By engaging in a business or enterprise that employs hundreds of employees in Wisconsin, Drexel is an employer within the meaning of Wis. Stat. §109.01(2).

**FACTS**

11. Drexel sponsors a book club that allows its full-time employees to read three sets of ten books each selected in advance by Drexel management. The books, in addition to covering a range of topics that are directly related to what Drexel's owners regard as Drexel's core values, also provide guidance in personal improvement, approaches to work and interacting with customers, and personal wellness that are designed to make the participating employees more effective and available employees for Drexel.

12. To participate in Drexel's book club, after reading each book each employee must also write a book report, and email the book report to employees in Drexel's Human Resources Department. Each book report must contain, in addition to a summary of the book, also a description of the employee's personal and professional reflections concerning the book.

13. To participate in Drexel's book club, after reading each book each employee is also required to have a meeting with either a supervisor or an employee in Drexel's Human Resources Department to discuss the book. These discussions are aimed at discovering what the employee learned by reviewing the book, and to help the employees apply what they learned from the book to become more effective and available employees for Drexel.

14. If an employee read, wrote acceptable book reports concerning, and met with a Drexel supervisor or human resources employee to discuss each of 10 books in a set within 12

3

months of starting the program, Drexel guaranteed to pay a $1,000 payroll bonus to the employee.

15. Plaintiff earned two bonuses of $1,000 each by participating in Drexel's book club in 2023. The amount of the bonuses for participating in Drexel's book club was $1,000 no matter how much money Plaintiff earned, and no matter how many or few overtime hours Plaintiff worked, during the time periods in which she earned the $1,000 payroll bonuses.

16. During the time periods in which Plaintiff read the books, completed book reports, and attended meetings to earn each of the $1,000 book club bonuses, she regularly worked more than 40 hours per week, and received overtime premium pay for her hours worked over 40 per week. Drexel did not pay Plaintiff any overtime premium pay as a result of, and on top of the $1,000 book club bonuses that it paid to her.

17. When Plaintiff became eligible to receive insurance form Drexel, she opted to receive long term and short-term disability coverage, but opted out of other forms of fringe benefits that Drexel offered, most prominently health insurance coverage.

18. At around the same time that Drexel began making deductions from Plaintiff's paychecks to pay for her share of payments for long term and short-term disability coverage, Drexel also began to pay Plaintiff $135 per quarter that was labelled a miscellaneous fringe benefit payment, so that Plaintiff received two $135 payments before the end of her employment with Drexel in May of 2024. Drexel withheld Social Security and Medicare taxes on the miscellaneous fringe benefit payment, just like it would for Plaintiff's hourly wages.

19. Upon information and belief, the $135 that Drexel paid to the Plaintiff per quarter was a cash payment that Drexel paid to Plaintiff because she opted out of receiving company health insurance.

20. Drexel did not impose any restrictions on how Plaintiff can utilize the $135 cash payment that she receives per quarter, so that she could, for example, use the money to purchase cigarettes.

21. Plaintiff would receive the same $135 per quarter for opting out of Drexel fringe benefits, regardless of how much or how little money she earned, and how many or how few overtime hours she worked, during the quarter that the $135 payments were for.

22. During the quarters for which she received the $135 payments, Plaintiff regularly worked more than 40 hours per week, and received overtime premium pay for her hours worked over 40 per week. Drexel did not pay Plaintiff any overtime premium pay on top of, and because it paid her bonuses for opting out of company fringe benefits.

23. When Plaintiff began her employment with Drexel, she worked at Drexel's Jackson, Wisconsin location. Even though other employees in the department started work at 6:00 a.m., Plaintiff was scheduled to start work at 6:30 a.m. because the employee whom she was assigned to work with was scheduled to start work at 6:30 a.m.

24. While Plaintiff was scheduled to start work at 6:30 a.m., and just like the employee she was assigned to work with, she regularly punched in 15-20 minutes before her scheduled start time. As soon as Plaintiff punched in, she would start performing the same staining, painting, and related work that she performed throughout her workday.

25. Plaintiff's direct supervisors, Brady and/or Shawn McMahon, would witness Plaintiff starting to perform productive work before 6:30 a.m.

26. Throughout the period that Plaintiff was scheduled to start work at 6:30 a.m., Drexel began to pay her at 6:30 a.m., though she had punched in and started to perform work 15-20 minutes or more earlier.

27.     Plaintiff regularly worked, and was paid for more than 40 hours per week while she had a start time of 6:30 a.m., so that she would have received more overtime pay had she been credited with her worktime between when she punched in and 6:30 a.m.

## COLLECTIVE ACTION ALLEGATIONS

28.     Plaintiff seeks collective certification for two separate groups of Drexel employees.  First, Plaintiff seeks certification of a collective of all hourly non-exempt Drexel employees who received cash bonuses for participating in the Drexel book club.  Second, Plaintiff seeks certification of a collective of all hourly non-exempt Drexel employees who received cash payments for opting out of company provided fringe benefits.  Plaintiff seeks to represent both collective for the time period starting with the earliest possible time permitted by the FLSA's two or three years statute of limitations, and ending with the present.

29.     The First Claim for Relief for violations of the FLSA may be brought and maintained as an "opt-in" collective action pursuant to Section 16(b) of FLSA, 29 U.S.C. §216(b), in that there was no reason why Drexel would have singled out Plaintiff, so that Plaintiff was subject to the uniform way Drexel programmed its payroll software to not include the cash payments for participating in the Drexel Book club and for opting out of company fringe benefits into the computation of the employees' regular rates of pay, so that employees did not receive any overtime premium pay as a result of their receipt of the cash payments.

30.     Because Plaintiff and other collective members were deprived of additional overtime premium pay as a result of how Drexel uniformly programmed its payroll software, the Court can uniformly decide Drexel's liability to each collective member by deciding whether under the FLSA, cash payments for participating in the Drexel book club and for opting out of company fringe benefits must be included in computing the regular rate.

## CLASS ALLEGATIONS

31. Plaintiff seeks to represent the following classes pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All hourly non-exempt Drexel employees who during the time period of May __, 2022 to the present either (a) received a cash payment for participating in the Drexel book club; or (b) received a cash payment for opting out of company fringe benefits.

32. Persons in the class identified above are so numerous that joinder of all members is impracticable. Upon information and belief, at any given time Drexel would employ approximately 800 hourly non-exempt employees, each of whom was eligible to receive cash payments for participating in the Drexel book club and/or opting out of company fringe benefits, so that over the past two years Drexel has employed hundreds of employees who qualify for one or more of the defined subclasses. The joinder of these employees is rendered even more impracticable once accounting for former employees who no longer reside in Wisconsin, and current employees who are economically dependent upon Drexel so that they may be more willing to passively participate in this action as class members, versus becoming a Named Plaintiff in a lawsuit against their current employer.

33. There are questions of law common to the proposed class that predominate over any questions solely affecting individual members of the class, most prominently whether cash payments that employees received for participating in the Drexel book club and for opting out of company fringe benefits must be included in the regular rate; and if so how additional overtime pay that Drexel owes to its employees for the cash payments should be computed. These common questions predominate over any need to apply uniform formulas to the individual payroll records of each class member to compute the amount of damages that Drexel owes to them.

34. Plaintiff's claims are typical of those advanced by each of the two proposed subclasses in that she received cash payments for participating in the Drexel book club and for opting out of company fringe benefits; and did not receive any additional overtime premium pay on top of, and because of these cash payments she received.

35. Named Plaintiff will fairly and adequately protect the interests of the Rule 23 class; and has retained counsel experienced in complex wage and hour litigation.

36. A class action is superior to other available methods for the fair and efficient adjudication of the controversy in that Defendant's common and uniform policies and practices denied the Wisconsin Unpaid Wage Class overtime wages to which they are entitled; and the damages that each class member has suffered is likely in the tens or hundreds of dollars, and therefore pale in comparison to what it would cost to individually litigate the factual and legal issues presented by this litigation. In addition, class certification is superior because it will permit the Court to resolve predominate legal questions that drive the resolution of this litigation, while obviating the need for unduly duplicative litigation that might result in inconsistent judgments about the legality of the Defendant's overtime pay computation practices.

**Count I.     Unpaid Minimum Wages and Overtime Pay Under the Fair Labor Standards Act.**

37. Plaintiffs re-allege, and incorporate by reference, the allegations contained in paragraphs 1-36 of the Complaint.

38. Drexel offered a cash bonus to its employees for participating in the Drexel book club, so that such participation could improve the participating employees' work performance, ability to lead, ability to interact with customers, availability, and alignment with what its leaders consider to be Drexel's values; and therefore make the participating employees better employees for Drexel. The cash bonuses for participating in the Drexel book club, just like other bonuses

designed to encourage employees to engage in off-duty behavior that makes them better employees for the employer such as education and fitness bonuses, therefore constitute remuneration for employment.

39. The cash payments for participating in the Drexel book club that Plaintiff and collective members received do not fall within any of the exceptions recognized by §207(e) of the FLSA in that (a) Drexel is obligated to make the payments once the employee finishes reading, completing book reports concerning, and meeting with a supervisory employee or human resources employee concerning each of the 10 designated books, so that the cash payments are earned by the employee engaging in a course of conduct prescribed by Drexel rather than gifts; (b) the payments for participating in the Drexel book club are not analogous to the loss time payments and expense reimbursements that qualify for exemption under §207(e)(2); (c) even if the cash payments are characterized as recognition for services performed, by announcing its program to pay the book club bonuses Drexel surrendered its discretion as to both the fact and amount of the payments long before the payments were made; (d) the cash payments are paid to the employee rather than to a trustee or third person, and have nothing to do with providing fringe benefits to employees; and (e) the cash payments are not any form of premium pay.

40. The cash payments that Plaintiff and collective members received for opting out of company provided fringe benefits, just like the wages they received, were a type of remuneration for the hours of work that they performed for Drexel.

41. The cash payments that Plaintiff and collective members received for opting out of company provided fringe benefits do not qualify for exemption under any provisions of §207(e) in that the cash payments were compensation for the employee's hours worked, the cash

payments were not bonuses paid in recognition for services performed, the bonuses were not paid to a trustee or third person, and the bonuses were not overtime premium payments.

`       42.     There is no basis for Drexel to claim overtime premium pay was already built into the amounts of the cash payments for participating in the Drexel book club and for opting out of company fringe benefits, in that the employees received cash payments of a fixed amount, rather than cash payments computed as a percentage of all compensation they earned during the time periods in which they earned the cash payments; and because they received the same cash payment amounts no matter how many or how few overtime hours they worked during the time periods in which they earned the cash payments.

43.     Drexel therefore violated the FLSA by failing to apportion the amounts of the cash payments for participating in the Drexel book club and opting out of company insurance back over the time periods during which the cash payments were earned, computing the increase to the weekly regular rate for each week that is affected by said apportionment, and paying to Plaintiff and collective members additional overtime premium pay equal to ½ of regular rate increase for each hour over 40 that was worked during the week.

44.     Drexel was aware that Plaintiff worked before 6:30 a.m. when she punched in before 6:30 a.m., when there was not a culture at Drexel's Jackson location for employees to punch in early and then wait until their scheduled start times to start working, and when its supervisors witnessed Plaintiff performing work before 6:30 a.m.

45.     Drexel suffered or permitted Plaintiff to perform work before 6:30 a.m. when it neither promulgated nor enforced any policies or rules that prohibited Plaintiff from performing work before 6:30 a.m., but instead accepted the benefits of the work she performed without paying for it.

46. During the time period when Plaintiff was scheduled to start work at 6:30 a.m., the time period between when she punched in and 6:30 a.m. should have counted as hours worked, so that Plaintiff was entitled to receive 1.5 times her hourly rate of pay for all additional hours worked over 40, once the time period between when she punched in and 6:30 a.m. is counted as hours worked. Plaintiff brings this claim for additional overtime pay for her unpaid work time between when she punched in and 6:30 a.m. on her own behalf only.

47. Drexel had some knowledge of its obligation to comply with the FLSA, as shown by its payment of overtime pay on all credited hours worked in excess of 40 hours per week, yet failed to adequately investigate whether it owes additional overtime premium pay on the Drexel book club and fringe benefit opt-out cash payments that it made to its employees; so that Plaintiff and all collective members are entitled to a three years statute of limitations for willful violations.

48. Because Drexel did not have an objectively and subjectively reasonable basis for its violations of the FLSA, Plaintiff and all collective members are entitled to recover 100% liquidated damages on all overtime wages owed to them.

49. Plaintiff and collective members are entitled to recover from Defendants their reasonable attorneys' fees and costs incurred in bringing their FLSA claims pursuant to §216(b) of the FLSA.

**Count II.    Claim for Straight Time and Overtime Pay Under Wisconsin Law.**

50. Plaintiff re-allege, and incorporate by reference, the allegations contained in paragraphs 1- 49 of the Complaint.

51. Under DWD §274.03, all employees are entitled to 1.5 times the regular rate of pay for all hours worked in excess of 40 per week.

11

52. Because Wisconsin law adopts the same concept of regular rate of pay as the FLSA, the Drexel book club and fringe benefit opt-out cash payments that Plaintiff and class members received must be included in computing their Wisconsin law regular rate, for the same reasons that those cash payments must be included in computing the FLSA regular rates of Plaintiff and collective members.

53. Drexel suffered and permitted Plaintiff to work between when she punched in and 6:30 a.m. under Wisconsin law, for the same reasons that it did so under the FLSA; so that the time periods between when Plaintiff punched in and 6:30 a.m. while she was scheduled to start work at 6:30 a.m. must count as hours worked under Wisconsin law as well.

54. Because Wisconsin law requires the payment of full wages rather than minimum wages for hours worked that should have been but was not paid, Plaintiff is entitled to straight time pay at her then applicable hourly wage rate for all unpaid work time between her punch in time and 6:30 a.m., plus overtime premium pay for all additional hours over 40 she worked, once her work time between her punch-in time and 6:30 a.m. is credited as hours worked.

55. Under Wis. Stat. §109.03(5) Plaintiff may maintain a lawsuit against Drexel to recover all straight time and overtime wages owed to her, while class members may maintain a lawsuit against Drexel to recover all overtime wages owed to them, that were not paid to them within 31 days of when the work that earned the wages was performed.

56. Pursuant to Wis. Stat. §109.11(2)(a) Plaintiff and class members are also entitled to recover 50% liquidated damages on all straight time and overtime wages that Drexel failed to pay to them; along with their actual reasonable attorneys' fees and costs incurred in prosecuting their Wisconsin wage claims as authorized by Wis. Stat. §109.03(6).

WHEREFORE, the Plaintiffs respectfully request the Court to enter an order that:

a.  Finds that Defendant is liable to Plaintiff and collective members for all unpaid wages, liquidated damages, attorneys' fees, and costs owed under the FLSA;

b.  Finds that Defendant is liable to Plaintiff and collective members for all unpaid wages, liquidated damages, attorneys' fees, and costs owed under Wisconsin law; and

c.  Grants to Plaintiff, collective members, and class members such other and further relief as the Court deems just and proper.

Dated this 28th day of May, 2024.

/s/Yingtao Ho
Yingtao Ho (State Bar No. 1045418)
yh@previant.com
The Previant Law Firm S.C.
310 W. Wisconsin Ave. Suite 100MW
Milwaukee, WI 53212
(414) 271-4500
(414) 271-6308 (fax)